O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARENA D., | Case No. 5:20-cv-01065 KES |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

## I.

## BACKGROUND

In December 2015 at age 34, Karena D. ("Plaintiff") applied for Title I and Title XVI disability benefits alleging an onset date of February 24, 2014, due to rheumatoid arthritis ("RA"), fibromyalgia, anxiety, and depression.  Administrative Record ("AR") 39, 196–208, 228, 232.  On October 4, 2018, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified along with a vocational expert ("VE").  AR 36–56. On November 29, 2018, the ALJ issued an unfavorable decision.[1]  AR 16–28.

---

[1] Plaintiff testified that she was diagnosed with RA at age 28 and it has caused progressively worsening pain and hand deformities.  AR 45.  A prior

The ALJ found that Plaintiff's "rheumatoid arthritis, fibromyalgia, lupus, interstitial lung disease,[2] degenerative joint disease of the bilateral knees, and obesity" were severe, medically determinable impairments.  AR 19.  The ALJ assessed that Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of light work.  AR 22.  As relevant here, the ALJ found that Plaintiff could "frequently" handle or finger with her bilateral upper extremities.  AR 22.  Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could perform her past sedentary work as a receptionist or customer order clerk as both actually and generally performed.  AR 27–28 (referring to Dictionary of Occupational Titles ["DOT"] codes 237.367-038 and 249.362-026).[3]   The ALJ concluded that Plaintiff was not disabled.  AR 28.

## II.

## ISSUES PRESENTED

Issue One: Whether the ALJ erred in discounting the opinion of state agency consultant Stuart L. Laiken, M.D., regarding limitations on Plaintiff's handling and fingering.  (Dkt. 22, Joint Stipulation ["JS"] at 4–5.)

Issue Two: Whether the ALJ erred in discounting the opinion of treating rheumatologist Amal Mehta, M.D., of Southland Arthritis.  (Id. at 4, 24.)

---

application was denied in August 2015.  AR 228.

[2] Interstitial lung disease can "cause progressive scarring of lung tissue [that] eventually affects your ability to breathe ….  Some types of autoimmune diseases, such as rheumatoid arthritis, also can cause interstitial lung disease." <https://www.mayoclinic.org/diseases-conditions/interstitial-lung-disease/symptoms-causes/syc-20353108> (last viewed Feb. 19, 2021).

[3] Per the DOT, working as a receptionist requires "frequent" handling, "occasional" fingering, and level 4 dexterity (meaning the lowest 1/3 excluding the bottom 10%).  DOT 237.367-038, 1991 WL 672192.  Working as an order clerk requires "frequent" handling and fingering and level 4 dexterity.  DOT 249-362-026, 1991 WL 672320.

2

Issue Three:  Whether the ALJ erred in discounting Plaintiff's subjective statements concerning the intensity of her pain and resulting functional limitations. (Id. at 4, 37.)

### III.

### DISCUSSION

**A.  ISSUES ONE AND TWO: Drs. Mehta and Laiken.**

**1.  The ALJ's Weighing of the Medical Opinion Evidence.**

Three doctors provided opinions about how Plaintiff's impairments limited her ability to use her hands.

• On February 2, 2016, Dr. Laiken opined that Plaintiff could use her bilateral upper extremities for only "occasional" fine and gross manipulations due to "severe arthritis."  AR 69–70, 84–85.

• On August 23, 2016, state consultative examiner K. Vu., D.O., opined that Plaintiff's only manipulative limitation was that her right upper extremity handling and fingering be limited to "frequent due to numbness."  AR 101–02, 116–17.

• On October 9, 2018, Dr. Mehta wrote a letter explaining that he had treated Plaintiff since May 2013 for RA, lupus, and fibromyalgia.  AR 1876.  Dr. Mehta opined that these autoimmune diseases caused "bilateral hand deformities" that "significantly limit[ed Plaintiff's] ability to use her hands."  AR 1876.  Dr. Mehta explained that Plaintiff's case was atypical, because she had tried "almost every FDA-approved medication" but continued to have "significant disability," in that she could not "grasp objects, pull, push; she cannot lift more than 5 pounds and cannot type on a computer.  She has difficulty writing due to her hand deformities."  AR 1876.

The ALJ gave "little" weight to the opinions of Drs. Laiken and Mehta and "great" weight to Dr. Vu's opinion.  AR 25–26.  The ALJ found that Plaintiff could perform "frequent" fingering and handling, meaning up to 6 hours in an 8-hour workday.  AR 22; see Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6,

1983 SSR LEXIS 30, at *14 ("'Frequent' means occurring from one-third to two-thirds of the time … [or] for a total of approximately 6 hours of an 8-hour workday.").

**2.      The ALJ's Finding of Inconsistency Is Not Supported by Substantial Evidence.**

The ALJ's primary reason for discrediting the opinions of Drs. Laiken and Mehta was a finding that they overstated the disabling effects of Plaintiff's RA, inconsistent with the weight of the medical evidence.  AR 25–27.  The ALJ also cited inconsistency between Dr. Mehta's opinion that Plaintiff "cannot type on a computer" (AR 1876) and Plaintiff's cousin's report that Plaintiff could use a computer to shop online (AR 260).  AR 26.  Finally, the ALJ noted that Dr. Laiken did not have the opportunity to review most of the medical evidence, which was received after he gave his opinion.  AR 26.

First, Dr. Mehta's opinion that Plaintiff "cannot type on a computer" is not an opinion that Plaintiff could not use a computer at all.  Being able to shop online, which can often be accomplished with a few mouse clicks, is not necessarily inconsistent with being unable to type or, more precisely, with being unable to type with the speed, stamina, and accuracy required to work as a receptionist or order clerk.  See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) ("Here, there is neither evidence to support that Orn's activities were 'transferable' to a work setting nor proof that Orn spent a 'substantial' part of his day engaged in transferable skills.").

Second, while it is true that Dr. Laiken could not consider any evidence from 2017 or 2018, neither could Dr. Vu, who gave his opinion only six months after Dr. Laiken gave his.  This is not a persuasive reason for giving Dr. Vu's opinion more weight than Dr. Laiken's.  See Perez v. Astrue, 250 F. App'x 774, 776 (9th Cir. 2007) (remanding in part because the ALJ's findings were "internally inconsistent" and thus "not supported by substantial evidence"): Hernandez v. Saul, No. 1:19-CV-01531, 2021 WL 84397, at *4, 2021 U.S. Dist. LEXIS 5096, at *10 (E.D. Cal.

4

Jan. 11, 2021) ("Material inconsistencies and ambiguities in the ALJ's decision

generally warrant remand.").  Further, Dr. Vu found *no* manipulative limitations to

Plaintiff's *left* upper extremity (AR 101, 116) despite objective evidence indicating

*bilateral* hand and finger limitations.  E.g. AR 334–36, 391, 453, 464, 470, 528.

Third, the ALJ cited six treating records (all which post-date both Drs.

Laiken's and Vu's opinions) as purportedly demonstrating why the opinions of Drs.

Laiken and Mehta are inconsistent with the weight of the medical evidence (AR

26), as follows:

| Item | Ex/Page | AR | Date | Description |
|---|---|---|---|---|
| 1 | 30F/11 | 1652 | 10/10/16 | Plaintiff was admitted to Inland Valley Medical Center ER after being rear-ended in a car accident.  She complained of "neck, back, and hand pain."  AR 1651. The ER ordered multiple x-rays.  AR 1653.  "X-ray reveals fracture of scaphoid [wrist bone].  She also has swelling and ecchymosis [bruising] of right fifth finger, full range of motion, negative for fracture on x-ray per radiologist.  Remaining x-rays of spine and chest are negative …."  AR 1650.  "She does have atrophy noted of thenar eminence [group of muscles on palm at base of thumb] bilaterally, consistent with chronic rheumatoid arthritis."  AR 1649–50.  She was given a splint for her right hand and pain medication.  AR 1650.  ER records also say, "Normal ROM, normal strength, no tenderness, no swelling, no deformity."  AR 1652. <br><br> Plaintiff followed up the next day with her primary care physician at Neighborhood Healthcare ("NH") who reported, "She was diagnosed with a closed fracture of navicular bone of right wrist.  She has a temporary cast and states her fifth finger is tender."  AR 1706, 1707 ("right forearm on splint").  Plaintiff was referred for a consultation for possible hand surgery.  AR 1708. |

| Item | Ex/Page | AR | Date | Description |
|------|---------|------|---------|-------------|
| 2 | 30F/8 | 1649 | 10/10/16 | X-ray thoracic of spine indicated no fracture or dislocation.  See AR 1656 (x-rays lumbar spine showing same). |
| 3 | 32F/17 | 1694 | 2/7/17 | Plaintiff followed up with Leah Patrick, D.O., at NH after visiting the Loma Linda University Medical Center ("LLUMC") ER complaining of tachycardia.[4]  AR 1963, 1698.  The note says Plaintiff denied "joint pain, swelling," but it also says that the denial of symptoms "applies except for what is mentioned in HPI [history of present illness]."  AR 1694.  Dr. Patrick noted no edema or tenderness.  AR 1694. <br><br> A month earlier, Plaintiff told NH she had heart palpitations and chest pressure.  AR 1696.  She also complained that "Pain in hands make it difficult to shower."  AR 1696.  This record has a similar note that Plaintiff denied joint pain "except for what is mentioned in HPI."  AR 1697.  Again, Dr. Patrick noted no edema or tenderness (AR 1697) but ordered Plaintiff a "shower bench due to pain and weakness from her RA" (AR 1698).  Dr. Patrick referred Plaintiff to rheumatology to treat her RA.  AR 1701. |
| 4 | 24F/7 | 1191 | 12/19/17 | X-ray of bilateral knees indicated "minimal degenerative" changes. |
| 5 | 24F/9 | 1193 | 12/19/17 | X-ray of bilateral hands indicated "mild to moderate joint space narrowing [of] the intercarpal joints and radiocarpal joint of both hands" and "very mild joint space narrowing." |

---

[4] LLUMC ER records reflect Plaintiff was admitted about a week earlier on January 26, 2017, complaining of "heart racing."  AR 606.  The ER staff observed "no swelling, no deformity" with "normal" motor and coordination.  AR 607.  They noted, "Patient has a history of [RA] and is between treatments …."  AR 612.

| Item | Ex/Page | AR | Date | Description |
|------|---------|-----|------|-------------|
|  |  |  |  | In "bilateral DIP and PIP joints [knuckles]," findings characterized as "compatible with history of [RA]." |
| 6 | 24F/8 | 1192 | 4/28/18 | A nerve conduction study found no electrical evidence of neuropathy. Both before and after this test, Dr. Mehta wrote, "Borderline right carpal tunnel cannot be excluded per neurology."  AR 1200, 1217. |

  a. Item 1.

Item 1 (AR 1652) does indeed say that Plaintiff had a normal range of motion, normal strength, no tenderness, and no swelling, as the ALJ noted.  AR 25. It is unreasonable, however, to interpret this ER record as meaning that Plaintiff had a full range of motion in her wrist and finger joints when the same ER gave her a splint for her right hand/forearm and pain medication.  AR 1650.  The ER staff expressly noted that some of Plaintiff's hand muscles had atrophied from disuse consistent with RA (AR 1649–50), suggesting that the notation of "normal strength" was not meant to apply to Plaintiff's hands.

  b. Item 2.

The ALJ identified Item 2 as an "x-ray scan of the lumber spine that indicated no abnormalities."  AR 36.  While spinal x-rays taken after Plaintiff's car accident showed no injuries, that appears irrelevant to the issue raised in this appeal concerning Plaintiff's ability to use her hands and fingers.  In contrast, an x-ray of Plaintiff's right hand taken after the accident showed "possible fracture scaphoid" and "degenerative changes radiocarpal joint."  AR 1656.

  c. Item 3.

The ALJ cited Item 3 to support the assertion that "other examinations indicate no tenderness of the extremities."  AR 26.  Dr. Patrick's progress notes all contain exactly the same language: "EXTREMITIES: no clubbing, cyanosis, or

7

1   edema, no erythema or tenderness."[5]  See AR 1697, 1701 (January 2017), 1694

2   (February 2017), 1691 (March 2017), 1683 (February 2018), 1679 (March 2018).

3   Progress notes with this notation include the visit during which Dr. Patrick found a

4   shower bench medically necessary for Plaintiff because she reported that arthritis

5   pain made showering difficult.  AR 1697–98.

6          Other doctors observed tenderness and joint abnormalities.  On February 18,

7   2014 (i.e., just days prior to her alleged onset date), Plaintiff went to the ER

8   complaining of left middle finger pain.  AR 1603.  She presented with "swelling"

9   and was "unable to straighten out her finger."  AR 1603.  The ER noted her history

10  of RA.  AR 1603.  They examined her left hand and saw "no deformity, left hand

11  tender to second and 3rd MCP joints with associated swelling."  AR 1605.  An x-

12  ray revealed "some widening of the scapholunate space at the carpal bones which

13  could be secondary to a ligament injury."  AR 1605.  The ER doctor opined, "I

14  thought that the patient's swelling and pain were secondary to her underlying

15  [RA]. … I advised patient to follow up with her rheumatologist."  AR 1606.

16         On June 7, 2014, Plaintiff returned to the ER complaining of "white spots"

17  on her left hand.  AR 1516–19.  The ER noted a "history" of RA but no erythema,

18  peripheral edema, or cyanosis with a "full range of motion of the joints in

19  extremities."  AR 1519–20.  Plaintiff was diagnosed as suffering from

20  hypopigmentation.  AR 1520.

21

22         [5] "Clubbing" refers to "a deformity of the finger or toe nails associated with a
    number of diseases," including interstitial lung disease.  <https://en.wikipedia.
23  org/wiki/Nail_clubbing> (last viewed March 9, 2021).  "Cyanosis" refers to "the
24  bluish or purplish discoloration of the skin or mucous membranes due to the tissues
    near the skin surface having low oxygen saturation."  <https://en.wikipedia.org/
25  wiki/Cyanosis> (last viewed March 9, 2021).  "Edema" refers to "the build-up of
26  fluid in the body's tissue."  <https://en.wikipedia.org/wiki/Edema> (last viewed
    March 9, 2021).  "Erythema" is "redness of the skin or mucous membranes, caused
27  by hyperemia (increased blood flow) in superficial capillaries."  <https://en.
28  wikipedia.org/wiki/Erythema> (last viewed March 9, 2021).

In June 2015, Babak Zamiri, M.D., of the UC Riverside Arthritis Medical Clinic, observed that Plaintiff reported pain and presented with "swollen joints" including "wrists, fingers, and knees." AR 528. Plaintiff was positive for "deformities and swelling" and "decrease ROM wrists." AR 334–36. Plaintiff re-established care with Southland Arthritis in December 2015. AR 390. At that time, she was "not on any meds." AR 390. She complained of 10/10 joint pain and swelling; Chandrakant V. Mehta, M.D.,[6] observed "synovitis msps PIP wrist diffusely, puffiness in both hands, synovitis and tenderness both wrists."[7] AR 391. He also noted "atrophy of hand muscles" and "poor grip." AR 470. He assessed her RA as "very active." AR 471.

By January 2016, Dr. Mehta observed "no synovitis," but an MRI revealed "flexor and extensor tenosynovitis, mcp effusions [swelling] and cortical [outer bone surface] irregularities. No ligamentous tear." AR 466. Dr. Mehta ordered hand and wrist x-rays and prescribed a "trial prednisone burst." AR 467. In February 2016, he reviewed the x-rays with Plaintiff and noted that her shortness of breath had "improved with prednisone burst." AR 464–65. He observed, however, that she again had "diffuse mcp, pip, b/l wrist and b/l knee synovitis." AR 464. In March 2016, he referred her to physical therapy for knee pain. AR 461–62. In May

---

[6] Drs. Amal Mehta and Chandrakant V. Mehta are both associated with Southland Arthritis. AR 396. The treating records indicate that Plaintiff primarily saw Dr. Amal Mehta. Hereinafter, the Court will refer to Dr. Amal Mehta as "Dr. Mehta" and Dr. Chandrakant V. Mehta as "Dr. C. Mehta."

[7] In RA, "the body's immune system attacks the lining of the joint capsule, a tough membrane that encloses all the joint parts. This lining (synovial membrane) becomes inflamed and swollen." Synovitis refers to inflammation of the synovial membrane, and it may be associated with observable symptoms such as swelling, redness, and/or warmth of the affected joint. See <https://www.mayoclinic.org/diseases-conditions/arthritis/symptoms-causes/syc-20350772> (last viewed February 19, 2021).

2016, he requested authorization for a "diagnostic ultrasound of bilateral hands to evaluate for synovitis and erosions."  AR 455.

In June 2016, after receiving the ultrasound results, Dr. Mehta noted that "MSK [musculoskeletal] ultrasound of b/l hands reveal erosions in the right 1st and 2nd mcp [metacarpal] joint and synovitis at the left flexor tendons."  AR 453.  In July 2016, Dr. Mehta observed Plaintiff was positive for "diffuse mcp, pip … synovitis."  AR 448.  He wrote, "MCP erosions on ultrasound."  AR 448.  He recorded results from ESR [erythrocyte sedimentation rate] and CRP [C-reactive protein] testing and requested authorization for electromyography ("EMG") testing.  AR 448; cf. AR 1112 (October 2016 ER records noting an "arthritis flare" but concluding that Plaintiff's symptoms are "anxiety-based").  Southland Arthritis's 2017 and 2018 records consistently document synovitis affecting Plaintiff's hand joints.  See, e.g., AR 1251 (April 2017: "atrophy dorsal muscle of hands; synovitis and ulner deviation; poor grip"), 1245 (June 2017: "diffuse MCP synovitis and ulnar deviation b/l hands"), 1219 (March 2018: "diffuse mcp synovitis, b/l hand reducible deformities"), 1298 (April 2018: referring Plaintiff for a surgical consultation "for hand deformities per patient request"), 1208 (May 2018: "warmth to b/l wrists").

Progress notes from NH (like the note from Dr. Patrick cited by the ALJ as Item 3) consistently defer to rheumatology (i.e., Dr. Mehta) for Plaintiff's RA treatment.  See, e.g., AR 1763 ("new patient" who "needs to establish care for new referrals to see Rheum"), 1761 ("Pt was referred to Rheum"), 1744, 1747, 1751 (noting outstanding referral to Rheumatology), 1736 ("arthritis: care instructions material was printed"),1732 ("Patient here for EDD forms to be filled out for temporary disability due to RA," but reflecting no diagnosis or treatment of RA during visit), 1730 (noting "EXTREMITIES: no clubbing cyanosis, or edema" but also noting "generalized joint point from RA").  An NH progress note dated December 4, 2015, states in response to Plaintiff's complaint of pain that "it has to

be her Rheumatologist who refills medications"; that NHC record does not mention RA as an "assessed" condition and continues to say "no clubbing, cyanosis, or edema" to describe Plaintiff's extremities.  AR 1750.  In contrast, a note from Dr. C. Mehta made about a week later on December 19, 2015, noted, "synovitis msps PIP wrist diffusely, puffiness in both hands, synovitis and tenderness both wrists." AR 391.

Read in the context of the whole record, the probative value of Dr. Patrick's notes seeming to indicate the constant absence of any joint swelling or tenderness is low.  It seems far more probable that Dr. Patrick did not examine Plaintiff's hands for warmth, swelling, or redness each time Plaintiff visited NHC, and that Dr. Patrick's progress notes simply repeated standard language denying extremity abnormalities, because Dr. Patrick knew that Plaintiff was receiving specialized RA treatment from Dr. Mehta and Southland Arthritis.  See Orn, 495 F.3d at 634 ("The primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations.").

d.      Item 4.

Item 4 is irrelevant to Plaintiff's ability to use her hands and fingers.

e.      Item 5.

The ALJ cites to Item 5, a December 2017 bilateral hand x-ray, as indicating only "mild to moderate" joint space narrowing and thus inconsistent with Dr. Mehta's opinion that Plaintiff's RA causes more serious functional limitations than those posited by Dr. Vu.  AR 26 (citing AR 1193 [radiologist's report]).

Dr. Mehta ordered these x-rays.  AR 1310.  He reviewed them with Plaintiff in January 2018, but his treating record does not interpret them.  AR 1307.  Among other things, the radiologist's report says, "A small effusion is seen in the right ulna styloid.  Mild fraying is seen in the left ulnar styloid.  Periarticular osteopenia is demonstrated."  AR 1193.  The x-rays also showed "tiny subcortical cysts."  AR

11

1193.  It concluded that these findings "are compatible with history of [RA]."  AR 1193.

These x-rays were taken long after Drs. Laiken and Vu offered their opinions.  After reviewing these x-rays, Dr. Mehta continued to observe that Plaintiff had "diffuse mcp synovitis, b/l hand reducible deformities."  AR 1306.  He later wrote, "her RA and Lupus [are] uncontrolled and she has active joint involvement with joint deformities."  AR 1304.  Dr. Mehta clearly did not think that these x-rays were inconsistent with his findings of synovitis or deformities or his later opinions concerning Plaintiff's limitations on using her hands.  No doctor other than Dr. Mehta ever reviewed these x-rays and considered how, if at all, they informed the severity of the functional limitations caused by Plaintiff's RA.  See Orn, 495 F.3d at 632 ("When an examining [or consulting] physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining [or consulting] physician are not 'substantial evidence.'").

In some cases, a person without medical training (like the ALJ or this Court) can see that an x-ray contradicts a medical opinion and explain why.[8]  This is not such a case.  Joint space narrowing and other bone conditions shown on x-rays may be insufficient to assess the severity of RA without correlation to the other imaging tests in the record, such as MRIs or ultrasounds.  The ALJ did not explain why or how the x-rays were inconsistent with Dr. Laiken's and Dr. Mehta's opinions of Plaintiff's handling limitations.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) ("The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.")

---

[8] For example, an x-ray showing only mild disc space narrowing may be understood as inconsistent with a claim of disabling pain caused by degenerative disc disease.

12

1    (citation omitted).  Item 5, therefore, is not substantial evidence supporting the

2    ALJ's finding of inconsistency.

3              f.      Item 6.

4          Finally, Item 6 reflects an April 2018 "normal" nerve conduction study on

5    both upper extremities.  AR 26 (citing AR 1192).  Again, Dr. Mehta ordered this

6    study and was aware of it.  AR 1209–10 (noting "normal" April 2018 test in May

7    2018 with comment, "presently, I think the patient has RA with fibromyalgia but

8    would not rule out UCTD [undifferentiated connective tissue disease] (an

9    overlap)").

10         Like the Item 5 x-rays, this EMG testing was done long after Drs. Laiken and

11   Vu offered their opinions.  No doctor other than Dr. Mehta considered whether this

12   "normal" EMG study undermined the conclusion that Plaintiff's RA caused serious

13   hand dysfunction, and he did not think it did.  It seems entirely plausible that while

14   such a study might rule out nerve damage as the cause of Plaintiff's pain, it would

15   not inform the degree to which joint pain or deformity caused by RA might impair

16   Plaintiff's ability to handle and finger.

17   **B.     <u>Remand for Further Proceedings Is Appropriate.</u>**

18         When an ALJ errs in denying benefits, the Court generally has discretion to

19   remand for further proceedings.  <u>See</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175–78

20   (9th Cir. 2000).  When no useful purpose would be served by further administrative

21   proceedings, however, or when the record has been fully developed, it is

22   appropriate under the "credit-as-true" rule to direct an immediate award of benefits.

23   <u>See</u> <u>id.</u> at 1179 (noting that "the decision of whether to remand for further

24   proceedings turns upon the likely utility of such proceedings"); <u>Garrison</u>, 759 F.3d

25   at 1019–20; <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1100–01

26   (9th Cir. 2014).

27         Here, remand for further proceedings is appropriate.  The ALJ may obtain

28   testimony from a medical expert who can review the totality of the medical

evidence and offer opinions as to whether it is, or is not, consistent with functional limitations on the use of Plaintiff's hands more restrictive than those in the current RFC or those opined by Drs. Laiken or Mehta.  The ALJ can consider if a consultative examination by a rheumatologist would be helpful.  If Plaintiff is limited to less-than-frequent handling and fingering, then the ALJ may also obtain testimony from a VE to determine the impact of such a limitation on other available work.  The ALJ may wish to consider vocational data presented by Plaintiff concerning the typing-related demands of any alternative work considered.  Finally, the ALJ may consider the other claims of error raised by Plaintiff on appeal, but not addressed herein, or any other issues relevant to the determination of Plaintiff's eligibility for benefits.[9]

## IV.

## CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that, pursuant to 42 U.S.C. § 405(g), judgment be entered REVERSING the decision of the Social Security Commissioner and REMANDING this matter for further proceedings consistent with this opinion.

DATED:  March 15, 2021

_Karen E. Scott_
KAREN E. SCOTT
United States Magistrate Judge

---

[9] For example, the outcome of Plaintiff's 2017 arrest for welfare fraud is unclear, but a conviction might impact Plaintiff's eligibility for benefits.  AR 1798.